**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | | |
|---|---|---|---|
| **BENJAMIN G. SCHEIE,** | ) | | |
| | ) | | |
| **Plaintiff,** | ) | **No. 16 C 9012** | |
| | ) | | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** | |
| | ) | | |
| **NANCY A. BERRYHILL[1], Acting** | ) | | |
| **Commissioner of Social Security,** | ) | | |
| | ) | | |
| **Defendant.** | ) | | |
| | ) | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Claimant Benjamin G. Scheie ("Claimant") brings this motion for summary judgment [10] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under 42 U.S.C. §§ 416(i) and 423(d) of the Social Security Act (the "Act"). The Commissioner filed a cross-motion for summary judgment [17] asking the Court to uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment [10] is denied, and the Commissioner's cross-motion for summary judgment [17] is granted.

**I. BACKGROUND**

**A. Procedural History**

Claimant filed an application for a period of disability and supplemental security income on January 23, 2012. (R. 20.) Claimant alleges that he became disabled on

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

1

September 8, 2008 due to HIV, depression, colectomy, hypersomnia, fecal incontinence, cataracts and implants in facial bones.  (R. 94.)  His application was initially denied on May 24, 2012, and again on November 16, 2012, after a timely request for reconsideration.  (R. 20.)  On November 28, 2012, Claimant filed his request for a hearing.  (*Id.*)  On February 25, 2014, he testified before ALJ Cynthia Bretthauer. (R. 33–93.)  On March 14, 2014, the ALJ issued a decision finding Claimant not disabled.  (R. 20–27.)  On March 25, 2014, Claimant requested review by the Appeals Council.  (R. 15–16.)  On July 20, 2016, the Appeals Council denied Claimant's request for review, at which time the ALJ's decision became the final decision of the Commissioner.  (R. 1–3.); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001); 20 C.F.R § 1 404.955, 404.981.  Claimant subsequently filed this action in the District Court.

### B. Medical Evidence

Claimant seeks DIB and SSI for disabling conditions stemming from HIV, depression, hypersomnia, colectomy, fecal incontinence, cataracts and implants in facial bones.  (R. 242.)

### 1. Relevant Medical Records[2]

#### a. Claimant's Sleep Disorder

The record shows Claimant started reporting daytime sleepiness in 2008 and had previously been diagnosed with sleep-disordered breathing and narcolepsy.[3]  (R. 338, 579.)  Claimant reported that he had episodes of sleep paralysis and had experienced episodes of sleep walking since he was between the ages of 10 and 12.  (R. 582.)

---

[2] Claimant's arguments only discuss his depression, HIV, and sleep disorder, so the Court only addresses records pertaining to those impairments.
[3] It was later confirmed that Claimant did not have narcolepsy.  (R. 720.)

Claimant reported being able to manage his hypersomnia more easily when he was in high school and college due to having a flexible work schedule and taking naps as needed. (*Id.*) His condition was more difficult to manage in his managerial job due to him not being able to take naps. (*Id.*) Claimant further reported his total sleep time was usually between 13 and 14 hours. (R. 585.) To help with his daytime sleepiness Claimant started taking Adderall in 2009. (R. 590.) At the time, Claimant indicated he felt good and did not feel sleepy with the present medication regimen. (*Id.*)

Then, on November 8, 2011 Claimant underwent a Multiple Sleep Latency Test. (R. 444–445.) The test revealed evidence of hypersomnolence that was thought to be due to reduced sleep time at night from untreated mild obstructive sleep apnea. (R. 445.) Claimant followed up with David Shen, M.D. in January and February of 2012 regarding his obstructive sleep apnea and reported his symptoms to be the same. (R. 446–447, 448–449.) Dr. Shen opined that he believed Claimant's daytime hypersomnolence was likely due to his untreated sleep-disordered breathing, although it did appear a bit out of proportion to the severity of the disease. (R. 446.) Dr. Shen's plan was to treat Claimant's obstructive sleep apnea and have Claimant return to the clinic for follow up. (*Id.*)

### b. Depression

In August of 2009, Claimant reported he was previously diagnosed with depression, but that he stopped seeing a psychiatrist because it was expensive and he was receiving medications from his primary care doctor. (R. 590.) Claimant underwent a Mental Health Phone Screen on February 18, 2011 by Kelly Ducheny, PsyD. (R. 546–549.) Claimant reported that the reason he was seeking therapy was due to him

being miserable at his job for at least five years and two of his dogs had recently passed away.  (R. 546.)  Claimant also stated that he tried to do things to help him not feel depressed such as go to the gym and see friends, but none of it helped.  (*Id.*)  Even with Claimant's efforts he still felt empty and became obsessed with planning his suicide. (*Id.*)  Claimant reported he had previously attempted to hurt himself 30 years prior by an Aspirin overdose but was not hospitalized.  (R. 547.)  Dr. Ducheny found Claimant's suicidal intentions to be at a low-moderate level because he expressed focus on receiving medical attention in the future for other issues.  (R. 548.)

Claimant first visited Frank Pieri, M.D. on January 29, 2010 for a psychiatric assessment.  (R. 436–437.)  Claimant then visited approximately ten additional times through February 7, 2012.[4]  (R. 439–440.)  Dr. Pieri completed a psychiatric report for Claimant on March 12, 2012 in which he reported that due to the severity of his sleep disorder, depression and anxiety, Claimant was unable to do any type of work.  (R. 463–466.)  Dr. Pieri also gave Claimant a Global Assessment of Functioning ("GAF") score of 45.[5]  (R. 463.)  Dr. Pieri again completed a psychiatric report a few months later on September 15, 2012, and on this form reduced Claimant's GAF score to 35.  (R. 687–690.)  Dr. Pieri listed Claimant's complaints and symptoms as fatigue, poor sleep, irritable, poor memory, suicidal, isolated, and withdrawn.  (R. 687.)  Dr. Pieri again

---

[4] Dr. Pieri wrote out the dates that Claimant visited with him on two sheets of paper, but his handwriting regarding the notes for those visits are predominantly illegible.

[5] Although the GAF is not used in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM V"), it was used in the previous version of that text ("DSM IV"), and is often relied on by doctors, ALJs, and judges in social security cases. *See Steele v. Colvin*, No. 14 C 3833, 2015 WL 7180092 at *1 (N.D. Ill. Nov. 16, 2015). The lower the score, the greater the degree of impairment. *Id.* A score between 41 and 50 indicates  "serious symptoms" such as suicidal ideation, severe obsessional rituals, or frequent shoplifting or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)."  A score between 51 and 60 represents "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* Anything above 60 would indicate mild symptoms. *Id.*

reported Claimant was unable to work.  (*Id.*)  The record also contains a letter dated July 16, 2012 written by Dr. Pieri with no addressee indicated.  (R. 760.)  In the letter Dr. Pieri stated he was treating Claimant for a psychiatric disorder and that Claimant met the criteria to travel with an Emotional Support Animal.  (*Id.*)

On October 15, 2012 Claimant underwent an Internal Medicine Consultative Examination for Disability Determination Services ("DDS") by Roopa Karri, M.D.  (R. 707–712.)  Upon mental status examination Dr. Karri opined that Claimant was able to relay a clear and concise medical history without apparent cognitive difficulties.  (R. 710.)  Claimant also showed no signs of depression, agitation, irritability or anxiety.  (*Id.*)  Dr. Karri also reported Claimant had a history of HIV with mildy decreased CD4 counts and undetectable viral loads.  (*Id.*)

A neurological exam taken on July 1, 2013 revealed normal results.  (R. 863.)  On January 12, 2014, Claimant met with Michael Johnson APN and reported that he was depressed and easily tearful, but denied any suicidal ideations.  (R. 936, 939.)  Claimant followed up on January 30, 2014 and reported that he did not want to go to therapy because it made him "bring up stuff" that he did not want to think about.  (R. 951.)  Claimant discussed coping strategies for his mood such as calling a friend to come over and play video games and walking his dog.  (*Id.*)  Claimant's current GAF score was listed as 71.  (*Id.*)

### c. HIV

Claimant was diagnosed with HIV in 2001 and it was noted throughout the record to be well controlled or unchanged.  (R. 388, 531, 558, 566, 876, 899, 908, 923.)  An HIV Report by DDS was taken on September 19, 2012.  (R. 695–700.)  The report

indicated Claimant has eczema, chronicsinusitis, depression, fatigue and was limited in maintaining social functioning.  (*Id.*)  However, the spaces provided for further elaboration or explanation were left blank.  (*Id.*)  The record showed that Claimant would follow up for HIV Management approximately every three months.  (R. 555.)

### d. Non-Examining Agency Consultants

On May 22, 2012, non-examining State agency physician Bharati Jhaveri, M.D., reviewed the records and opined Claimant's impairments to be inflammatory bowel disease, sleep-related breathing disorders and affective disorders.  (R. 99.)  Non-examining State agency consultant Howard Tin, Psy.D., also reviewed the records and opined that Claimant had an affective disorder with mild restrictions in activities of daily living, no difficulties in maintaining social functioning, maintaining concentration, persistence or pace and no episodes of decompensation.  (R. 99–100.)  Upon reconsideration on November 1, 2012, non-examining State agency physician Calixto Aquino, M.D., reviewed the record and additionally concluded that Claimant's HIV was a severe impairment.  (R. 127.)  Dr. Aquino further opined that Claimant had mild restrictions in activities of daily living and no difficulties in the remaining B Criteria as previously found by Dr. Jhaveri.  (R. 128.)  Dr. Aquino opined that Claimant had the residual functional capacity to lift/carry up to 20 pounds occasionally and 10 pounds frequently, and could sit, stand, or walk for up to six hours in an eight-hour workday.  (R. 131.)

### C. Claimant's Testimony

On February 25, 2014, Claimant testified before ALJ Bretthauer regarding his impairments.  (R. 39.)  He testified that he lived in an apartment owned by his mother.

(*Id.*)  He previously received unemployment for one year after being laid off and receives food stamps.  (R. 39–40.)  Claimant testified that he does not drive, but takes public transportation and can walk to the grocery store and pharmacy.  (R. 40.)  Claimant further testified that he was laid off otherwise he might have kept working.  (R. 41.)  When asked if Claimant believed he could still perform his most recent position as a manager he answered in the negative.  (*Id.*)  Claimant explained he believed he could not work due to his sleeping problems, depression and bowel issues.  (*Id.*)  He testified part of the reason he was laid off was because he was having trouble staying awake on the job.  (R. 65.)  Claimant testified that he has not looked for another job since being laid off.  (R. 43.)

The ALJ inquired about Claimant's bowel condition which Claimant testified began with a surgery in March of 2011.  (*Id.*)  Claimant testified that there were not many options for resolving his bowel issues after the surgery and he was not taking any medication for it.  (R. 44.)  Claimant also testified that he still suffers from fecal urgency and pain.  (*Id.*)  He frequently experiences immediate needs to go to the bathroom which he believes will make it hard for him to work.  (R. 70.)

When discussing his HIV Claimant conceded that his condition is stable.  (*Id.*)  Claimant testified that his medication might be causing his sleepiness and even though he takes Adderrall during the day, he is still distracted.  (R. 46.)  He testified that he sometimes gets skin infections such as dermatitis.  (*Id.*)  Some creams will help but it never completely goes away.  (R. 47.)  At the time of the hearing Claimant testified he had an outbreak on his face.  (*Id.*)

When asked about how his depression affects him, Claimant testified that he will break into crying spells that prevent him from doing everyday tasks such as cleaning and laundry. (*Id.*) Claimant also mentioned having hallucinations and feelings of worthlessness that make him incapable of doing things. (*Id.*) Claimant also testified that he did not experience these feelings while he was working nor was he on any anti-depressants or depression medication at that time. (R. 47–48.) The ALJ asked if it was possible that Claimant was experiencing these symptoms due to him not working. (R. 48.) Claimant responded that he did not know if being employed would help his symptoms to cease. (*Id.*) Claimant further testified that he declined therapy on several occasions because he did not want to focus on the issues that were making him depressed and he hoped that the medication would help him stabilize his feelings. (R. 49.)

The ALJ referenced that Claimant had previously been a social worker which would make him privy to the best course of treatment for his condition. (*Id.*) Claimant responded that it has been hard for him to find a psychiatrist after his previous psychiatrist retired. (R. 50.) Claimant testified he is taking several anti-depressants which have a moderate effect on him. (*Id.*)

Claimant testified that from 2009 to 2011 he was still fairly active and would lift weights, go for walks and rollerblade. (*Id.*) He stopped doing these things because he is no longer motivated to do those activities. (*Id.*) Claimant also testified that he used to visit friends and go out on occasion. (R. 51.) He no longer does these activities because he does not have an income and his pain makes him just want to lay down. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The ALJ "must build an accurate and logical bridge from the evidence to her conclusion," although she need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.' " *Carlson v. Shalala*, 990 F.2d 180, 181 (7th Cir. 1993)

(per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted)).

**B. Analysis under the Social Security Act**

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes. In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

**C. The ALJ'S Determination**

The ALJ applied the five-step analysis. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his alleged onset date of September 8, 2008. (R. 22.) At step two, the ALJ found Claimant suffered from the following severe impairments: HIV positive; history of diverticulitis, status post

colectomy; obstructive sleep apnea; bilateral shoulder tears, status post right shoulder surgery; plantar fasciitis; and major depressive disorder.  At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23–24.)  Next, the ALJ determined that Claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that he is limited to occasional bilateral fine manipulation and fingering, no constant bilateral reaching overhead; is limited to simple and detailed, but not complex tasks; and should have only occasional contact with the general public.  (R. 24.)  Based on this RFC, at step four, the ALJ found that Claimant was unable to perform any past relevant work.  (R. 25–26.)

Lastly, at step five, the ALJ found that through the date last insured, given Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers that Claimant could perform, such as housekeeper, cafeteria attendant and machine tender.  (R. 26–27.)

Claimant now argues that the ALJ (1) failed to follow the treating physician rule; (2) cherry-picked the evidence not favorable to Claimant; and (3) failed to consider paragraph K of Listing 14.08.  We address each argument in turn below.

### D. The ALJ Properly Considered the Opinion of Claimant's Treating Physician.

Claimant first contends that the ALJ erred in failing to give controlling weight to his treating physician Dr. Pieri.  (Dkt. 10-1 at 4–5.)  A treating physician's opinion receives controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record.  *See* 20 C.F.R. § 404.1527(c)(2); *see also Punzio v.*

*Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. See *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). If an ALJ denies a treating physician's opinion controlling weight, she is still required to determine what value it merits. *See* 20 C.F.R. § 404.1527(c); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). In assigning that value, the ALJ must "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."[6] *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c).

Here, the ALJ did not give controlling weight to one of Claimant's treating physicians, Dr. Pieri. (R. 25.) The ALJ explained this was partially due to the record not supporting the severity of the functional limitations or GAF scores given by Dr. Pieri. (*Id.*) On February 3, 2012, Dr. Pieri indicated Claimant had a GAF score of 45. (R. 463.) The ALJ stated if this was Claimant's true GAF score, she would expect to find some impairments in reality testing or major impairment in several areas of functioning in the record. (R. 25.) Six months later on August 8, 2012, Dr. Pieri lowered Claimant's GAF score to 35. (R. 687.) The ALJ stated that a GAF score of 35 reflects behavior considerably influenced by delusions or hallucinations or serious impairment of communication or judgment or inability to function in almost all areas. (R. 25.) The ALJ found that the longitudinal record did not demonstrate support for such severe functional limitations and also rejected Dr. Pieri's conclusion that Claimant was unable to work as

---

[6] The SSA recently adopted new rules for agency review of disability claims involving the treating physician rule. See 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017). Because the new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable in this case. (*Id.*)

that is a decision reserved for the Commissioner. (*Id.*) SSRs 96-5p and 06-3p. The ALJ then gave greater weight to the medical expert, Allen Heinemann, M.D.'s opinion because she found his opinion to be more consistent with Claimant's actual level of function and activity. (*Id.*)

Claimant contends that the ALJ failed to properly follow the regulation for evaluating a treating physician's opinion by not crediting Dr. Pieri's GAF score of 35 and instead favoring with medical expert, Dr. Heinemann. (Dkt. 10-1 at 5.) Claimant argues that the ALJ dismissed Claimant's ongoing mental issues including that he was hospitalized for depression, hears voices in his head and has sudden bouts of crying at random times. (*Id.*) Claimant merely cites back to the ALJ's decision without any citations to his actual medical records to support his argument. Claimant fails to specifically identify, with citations to the *record*, what evidence supports Dr. Pieri's findings or any evidence he sees as being dismissed.

Although not argued by Claimant, the Court notes that the ALJ did not fully discuss the longitudinal relationship between Claimant and Dr. Pieri as required by the treating physician rule, but finds this to be harmless error. The Court concludes it is appropriate to *sua sponte* invoke the harmless error doctrine here because the Court is confident that, if this case were remanded and if the ALJ then explicitly applied the treating physician rule, she would reach the same result. *See Alvey v. Colvin*, 536 Fed. Appx. 792, 794 (10th Cir. 2013); *Smith v. Colvin,* 2015 U.S. Dist. LEXIS 33462, at *11 n. 2 (W.D. Okl. Feb. 23, 2015); *Mangan v. Colvin*, 2014 WL 4267496, at *1, 2014 U.S. Dist. LEXIS 120515, at *2 (N.D. Ill. Aug. 28, 2014).

### E. The ALJ Did Not Cherry-Pick the Record.

Next, Claimant appears to argue that the ALJ erred by cherry-picking evidence that discounted his depressive symptoms. (Dkt. 10-1 at 5.) The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 Fed.Appx. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as he builds a logical bridge from the evidence to his conclusion. *Id.* In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

Here, the ALJ discounted some of Claimant's subjective allegations regarding his depression due to lack of corroborating objective medical evidence and Claimant's current activities. (R. 25.) The ALJ's reasoning included that Claimant's depressive symptoms did not occur until after he stopped working and she noted that Claimant performs most activities necessary and socializes with friends. (*Id.*) The ALJ also references how Claimant declined to undergo therapy in preference to medication and that overall Claimant's depression-related functional limitations are inconsistent with the medical evidence of the record. (*Id.*) In terms of objective evidence, the ALJ referenced that Claimant was diagnosed with major depressive disorder and that there was one reported hospitalization. (R. 23.) The ALJ also discussed the GAF score finding of 45 where it was noted that Claimant's sensorium and mental capacity were intact as well as the abilities to perform calculations and think abstractly. (*Id.*) Dr. Pieri later lowered Claimant's GAF score to 35 and the ALJ noted that there was no evidence

to support this opinion.  (*Id.*)  The ALJ also considered a depression screening record that stated Claimant had suicidal ideation.  (*Id.*)

Claimant argues that the ALJ went to "great lengths" to discount his depression symptoms by only citing Claimant's improvements.  To support this argument, Claimant cites to the hearing transcript instead of specifying where in the ALJ's opinion he interpreted the ALJ's findings to be only showing Claimant's improvements. Additionally, Claimant looks to *Garrison v. Colvin* to suggest it is error for an ALJ to pick out a few isolated instances of improvement since there can sometimes be cycles for improvement when discussing mental health issues.  759 F.3d 995, 1017 (9th Cir. 2014).  While it is error for an ALJ to pick out only isolated incidents, Claimant has failed to direct the Court in a useful manner to any specific evidence that the ALJ allegedly overlooked or failed to consider.

It is also worth noting that Claimant failed to properly develop this argument with citations to supporting legal authority.  As such, this argument could otherwise be found waived as perfunctory.  *Moss v. Astrue*, No. 09-1196, 2010 WL 2572040, at *6 (C.D. Ill. June 22, 2010) (*citing U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived")); *Hunger v. Allis-Chalmers*, 797 F.2d 1417, 1430 (7th Cir. 1986) (Moreover, even an issue expressly presented for resolution is waived if not developed by argument).

### F. Claimant Failed to Meet His Burden Showing He Met Listing 14.08.

Claimant argues that the ALJ failed to properly assess his HIV at step three, but the Court disagrees.  (Dkt. 10-1 at 6.)  In order to receive an award of DIB and SSI at

step three, the claimant, who bears the burden at this step, must satisfy all of the criteria in the specific listing at issue. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). An ALJ's failure to mention specific listings, "if combined with a 'perfunctory analysis,' may require a remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583, (7th Cir. 2006)(*quoting Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "On the other hand, an ALJ's failure to explicitly reference a relevant listing does not alone require reversal." *Knox v. Astrue*, 572 F.Supp.2d 926, (N.D. Ill. 2008) (*citing Rice v. Barnhart*, 384 F.3d at 369–370).

Here, at step three, the ALJ examined paragraph A of Listing 14.08 but not paragraph K. The ALJ stated Claimant did not meet 14.08(A) because there is no evidence of an ongoing bacterial infection secondary to HIV and that the medical evidence suggested that Claimant's HIV is controlled. (R. 23.) Claimant does not contest the ALJ's finding in regards to paragraph A of the Listing, only that paragraph K should have been considered.

Listing 14.08(K) refers to repeated manifestations of HIV infection, including those listed in 14.08(A–J), but without the requisite findings for those listings, or other manifestations resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace.

20 C.F.R Pt. 404, Subpt. P, App. 1 § 14.08(K).[7]

Claimant argues that he meets the paragraph K criteria because his HIV and medications cause him to suffer from severe hypersomnolence and fatigue. (Dkt. 10-1 at 6.) Claimant provides two record cites in support of his alleged fatigue and sleep disorders. (*Id.*) The first record is from November 4, 2011 where it is noted Claimant has a history of hypersomnolence and the second is from October 15, 2012 where Dr. Kari notes upon impression that one of Claimant's problems is a history of a sleep disorder. (R. 452, 710.) These cites from the record only show two occasions, documented more than a year apart, on which Claimant's sleeping issues were documented.

The Listing at issue specifically requires "repeated manifestations of HIV infection" and the SSA defines "repeated" as "occur[ing] on an average of three times a year, or once every 4 months, each lasting 2 weeks or more, or [if not] for 2 weeks, [then] substantially more frequently than three times in a year or once every 4 months; [occurring] less frequently than an average of three times a year or once every 4 months but last[ing] substantially longer than 2 weeks." Listing 14.00(I)(3). The evidence referenced by Claimant does not establish a repeated manifestation nor is it specific to the extent of Claimant's condition and standing alone is not enough to satisfy Claimant's burden. *See Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).

The Court would further point out that even if Claimant did show that he had repeated manifestations of severe fatigue in relation to his HIV infection, he still failed to show that he also had a marked limitation in one of the listed categories which is

[7] Listing 14.08 is now reserved and the Listing for HIV has been recodified at Listing 14.11. *See* 81 FR 86915-01, 2016 WL 7013724. For our purposes, revised Listing 14.11(I) is almost identical to Listing 14.08(K).

required to meet the listing.  The repeated manifestations standing alone would be insufficient and thus, Claimant has failed to satisfy his burden of showing that he meets the Listing.  *Rice*, 384 F.3d at 369. (The applicant must satisfy *all of the criteria* in the Listing in order to receive an award of disability insurance benefits and supplemental security income under step three) (emphasis added).

Because Claimant did not submit any medical evidence to support a finding that he satisfied the criteria of Listing 14.08(K), the ALJ did not err when he failed to discuss that paragraph of the Listing.  *See Scheck v. Barnhart*, 357 F.3d 697, 700 (accepting the ALJ's terse discussion on a listing where "there was no evidence which would support the position that [claimant] met or equaled the listing.").  Claimant's request for remand on this issue is denied.

## III.    CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment [10] is denied and the Commissioner's motion for summary judgment [17] is granted.  The decision of the ALJ is affirmed.  It is so ordered.

**DATED:  April 2, 2018**

*Michael T. Mason*

**The Honorable Michael T. Mason**
**United States Magistrate Judge**